UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNULFO LAMAS GALVAN,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | No. 1:24-cv-00340-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT**<br><br>**(Doc 17, 19)** |

I.      **Introduction**

Plaintiff Arnulfo Lamas Galvan appeals the decision of the Commissioner of Social Security denying his applications for disability insurance benefits (DIB) and supplemental security income under Titles II and XVI of the Social Security Act.[1]  Because substantial evidence and applicable law do not support the ALJ's decision, the appeal will be granted.

II.      **Factual and Procedural Background**

On July 8, 2016, Plaintiff initially applied for DIB alleging disability beginning on January 1, 2015, based on left knee problems, vision problems and cardiac problems, among other conditions.   AR 255.   The claim was denied initially on November 7, 2016, and upon reconsideration on May 14, 2018.  On March 4, 2020, the ALJ held a telephonic hearing.  AR 39–61.  The ALJ issued an unfavorable decision on April 24, 2020.  AR 17–38.  The Appeals Council denied review on March 9, 2021.  AR 1–7.  Plaintiff filed an appeal in this Court,[2] after which the parties stipulated to the remand the matter to the agency for further proceedings.  AR 22–33; 1265.

On remand, the ALJ held two additional hearings, on March 1, 2023 and September 20, 2023.  AR 1179–1203; 1206–1234.  The ALJ issued an unfavorable decision on November 27,

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  Docs. 9, 10.

[2] *See* 21-cv-00728 (ECF No. 22).  The parties stipulated to remand before briefing was completed and the Court entered an order with the parties' agreed upon language.  *Id.*  As such, there is no suggestion by either party that the matter would qualify for a related case transfer under Local Rule 123, nor is there any reason to believe that efficiency or judicial economy would be served by such a transfer.

2023 (AR 1146–75), after which the Appeals Council denied review and this appeal followed.

### III.   The Disability Standard

Under 42 U.S.C. §405(g), this court has the authority to review the Commissioner's denial of disability benefits.  Reversal is appropriate when the ALJ's findings are based on legal error or unsupported by substantial evidence."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is that which could lead reasonable minds to accept a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

The court must consider the record as a whole, not isolate a specific portion thereof. *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

A disability claim is evaluated using five-step analysis.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically

determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2015, through the date last insured, September 30, 2017.  AR 1156.  At step two the ALJ found that Plaintiff had the following severe impairments: mild degenerative joint disease left knee; mild to moderate degenerative changes of the right shoulder; mild degenerative changes of the left shoulder; immature bilateral cataracts; and obesity.  AR 1156–57.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 1157–58.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) with the following limitations:

> occasionally climb ladders, ropes, or scaffolds, and he could frequently balance, kneel, crouch, crawl, or climb ramps and stairs. He could frequently reach with the bilateral upper extremities. He could not perform jobs that require discrimination of very small objects, particularly at a distance. He could tolerate frequent exposure to extreme cold, vibration, or hazards.

AR 1158–66.

At step four the ALJ concluded that Plaintiff could perform his past relevant work as a tractor trailer truck driver which was classified as medium exertional work.  AR 1167.   The ALJ

made an alternative finding at step five in reliance on the VE's testimony concluding that there were jobs existing in significant numbers in the national economy which Plaintiff could perform, all of which were classified as medium exertional work: patient transporter, courtesy clerk bagger, and agricultural packer.  AR 1168.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time from the alleged disability onset date of January 1, 2015, through his date last insured of September 30, 2017.  AR 1168.

## V.   Issues Presented

Plaintiff asserts three claims of error: 1- that the ALJ failed to comply with the remand order or cure the error identified therein; 2- that the ALJ failed to properly address the SSI claim; and 3- that the ALJ failed to address Plaintiff's vision loss and cardiac condition.

### A.   RFC Generally; Compliance with Remand Order

#### 1.   Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the

facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Evidence post-dating the date last insured can be considered to the extent it is probative of pre-DLI functioning. *See Turner v. Comm'r of Social Security*, 613 F.3d 1217, 1228–29 (9th Cir. 2010).

## 2.    Analysis

Chiefly at issue on remand was evidence of Plaintiff's left knee impairment post-dating the date last insured (DLI), and whether it related back to the period at issue. The Appeals Council gave the following explanation on remand, truncated for the sake of brevity, which gives the relevant history concerning the left knee:

> The hearing decision does not adequately consider the [] knee impairment in assessing the [RFC]. Specifically, it was not considered [if] evidence documenting a worsening [thereof] dated after the [DLI] reasonably related back to the relevant period. Notably, [his] knee impairment was established prior to the [DLI] of September 30, 2017. [He] was assessed with chronic pain of the left knee in late 2016 [Ex. 18F at 10] and a left knee x-ray showed mild degenerative changes and possible tiny intraarticular loose body [Ex. 3F at 36]. [MRI] dated in April 2018 . . . showed a complex tear to the posterior horn and body of the medial meniscus with extrusion into the superior meniscortibial recess, mucoid anterior cruciate ligament degeneration, and severe changes in the medial joint compartment [Ex. 18F, at 124, 129]. Several months later, [he] underwent left knee arthroplasty [Ex. 8F at 5].
>
> It is further noted that in assessing the [RFC] . . . of medium work, the [ALJ] relied upon the opinions of [consultants] . . [who] did not find [any] severe knee impairment [Ex. 1A at 7; 4A at 8]. [or] have the opportunity to the review the April 2018 MRI to consider whether [it] related back to the period at issue. A treatment record references a 10+ year history of left knee pain and notes multiple injections have been tried is also noted (Ex. 7F at 1]. However, the medical evidence of record contains very little documentation of [treatment or injections] . . . It is possible this evidence is dated prior to the [DLI], and as such, may establish that the claimant's knee impairment was more limiting during the relevant period . . .
>
> The decision does not . . . adequately narrat[e] the [RFC] . . . The [ALJ] found the claimant had numerous physical impairments, including mild degenerative [joint] disease of the left knee and obesity . . . Yet, he found the claimant capable of [medium work] . . . Notably, the [ALJ] found the claimant's physical condition was compounded by his obesity, however, it is not explained how . . .
>
> The [ALJ] [did] not adequately evaluate the claimant's subjective allegations . . . the [ALJ] noted the [allegations] are not supported by objective medical findings and

history of medical treatment . . . Ultimately, the subjective allegation evaluation is inadequate because the [ALJ] did not consider [whether] post-[DLI] evidence . . . relate[d] back to the period at issue, specifically, the MRI documenting severe degenerative changes to the knee . . . Furthermore, the [ALJ] did not consider daily activities in assessing subjective allegations, and notably, the claimant was repeatedly described by treatment providers as having a sedentary lifestyle (Ex. 3F at 9, 26; 10F at 6, 12, 17, 23; 18F at 14, 20, 25, 31, 37, 49, 55, 61, 70, 84, 92, 100, 110, 115, 130, 135, 140, 145, 151) . . .  AR 1273–75.

On remand, the ALJ was directed to obtain additional evidence concerning the claimant's left knee including "if necessary . . . evidence from a medical expert related to the date of onset," and proceed through the sequential process as appropriate.  AR 1275.

In response, the ALJ addressed the Appeals Council order as follows:

I would like to conclude this portion of this decision to explain the factors discussed in the Appeals Council order . . .

With respect to the issue of the claimant's knee, I did obtain the opinion of Dr. Terry at Exhibit 20F in which she also did not find any reason to relate the knee MRI from April 2018 to a period prior to the expiration of the date last insured . . .

In giving him a large benefit of the doubt, I simply provided <u>additional restrictions related to the knee</u> in combination with his obesity, including limiting his ability to carry weight, balance, stoop, kneel, crouch, crawl, or climb . . .

The next area I would like to discuss is the concern about a one-off note in the record discussing "multiple injections" in his knee (Exhibit 7F/1, 3). To get ahead of it, I would also note that the claimant alleged a 10+ year history of left knee pain at that same time (Id.). However, neither subjective allegation is supported by anything in the record other than this one-off report

. . .

Interestingly, there are no real allegations of knee pain prior to the date last insured. Indeed, there are far more denials of musculoskeletal pain or symptoms found in his records than allegations of knee pain, including a denial of musculoskeletal pain in August 2017 (Exhibits 3F/21; 10F/3, 39, 87). <u>There was an ambiguous reference to joint pain in October 2017</u>, but that was no longer present in December 2017 and January 2018 (Exhibit 18F/97, 103, 111) . . .

Certainly imaging of his knee was ordered in November 2016 <u>and likely would not have occurred in a complete absence of at least one allegation of knee pain, but even the radiologist noted only noted mild degenerative changes at that time</u> (Exhibit 3F/36). . . . The April 2018 MRI was ordered consistent with the new allegation of knee pain at that time with the orthopedic referral and physical therapy referral

occurring the following month in May 2018 (Exhibit 18F/118, 124, 127).

Indeed, the first visit to the orthopedist occurring in June 2018 (Exhibit 7F/1). At that point, the claimant had reported a progressive worsening of his pain without any specific timeframe of this worsening . . .

So effectively there are no documented complaints of knee pain until well after the date last insured despite an x-ray being taken of his left knee in November 2016. There are only denials of musculoskeletal issues until one occasion the month after his date last insured, and even then, they do not reappear until April 2018 when things rapidly progress to his getting a total knee arthroplasty in February 2019. Despite zero references to knee pain during the period at issue, he was fully capable of reporting myriad other symptoms to his primary care provider and even the chiropractor for a very brief period of time. He was not referred to any specialists or physical therapists during the period at issue. His pain levels are regularly reported to be 0/10 with this level being noted on 10 occasions, including in August 2017 (Exhibit 18F/3, 16, 22, 27, 33, 45, 57, 63, 80, 87). The exceptions are rare and occur at the 3-4 visits with his chiropractor in late 2016 for neck and shoulder pain as well, a 3/10 level in September 2016, and a 5/10 level pain in December 2016 and May 2017 without specific attribution to location or cause (Exhibit 18F/5- 18, 39, 51, 70)

. . .

Aside from this, the diagnostic and objective evidence is not consistent with his alleged debilitating and functionally limiting knee pain . . . The most significant abnormal findings were made by a chiropractor, who is not an acceptable medical source, and did not document any knee abnormalities over the four-month period he saw the claimant in August to December 2016 (see Exhibits 3F/16, 18; 18F/5-13). It seems truly remarkable that not one single abnormal physical finding related to his knee would be made through October 2017 if, indeed, the condition was *as limiting and debilitating as alleged.*

Diagnostically, a radiologist interpreted his right knee x-rays to have only mild degenerative changes based on mild narrowing of the medial patellofemoral joint spaces with a possible, but not confirmed, loose body being noted (Exhibit 3F/36). Again, I am not interpreting the findings to be mild, but the radiologist did, which is not suggestive of any significant limitations.

. . .

To summarize, the claimant has alleged an onset of disability beginning on January 1, 2015. There are no medical records prior to April 2016. There is no evidence of any of the purported injections he told the orthopedist about in June 2018. Even after he begins treatment in April 2016, there are no specific knee complaints made between April 2016 and March 2018, a nearly two-year period of time that includes the 6 months following the date last insured. The one piece of evidence related to his knee was interpreted as having only mild degenerative changes in November 2016, and there were no abnormal findings made with his knee or gait by any

provider with no real musculoskeletal abnormalities being documented by any acceptable medical source prior to the expiration of the date last insured. However, once he does begin to complain of knee pain in April 2018, he is quickly referred out for an MRI that shows significant degermation and meniscal tears and quickly results in referrals for both physical therapy and orthopedics that ultimately resulted in his February 2019 knee replacement that provided him with good relief.

So the ultimately question is what is more likely than not… that the claimant's left knee that was replaced in February 2019 was at the same or near the same level of debilitating pain and functional loss all the way back to January 2015 despite the minimal diagnostic findings, dearth of subjective complaints and objective findings related to the knee, and the complete lack of treatment for the knee through the date last insured, or that his function was largely intact until he began to experiencing significant knee pain in April 2018 well after the date last insured that quickly resulted in referrals for an MRI, physical therapy, and an orthopedic consult that resulted in the knee replacement in February 2019? Given the overwhelming weight of the evidence and the rapidity in which his knee complaints were addressed once made, I find the latter to be far more likely than not and that the claimant was at least capable of performing the residual functional capacity above, if not even more capable. I have given him an enormous benefit of the doubt in light of the limited diagnostic findings and pain complaints between January 1, 2015, and September 30, 2017, and any error in finding the claimant to be more limited than supported in the residual functional capacity above would obviously be harmless since fewer restrictions would obviously not further restrict the occupational base.

AR 1160–64 (emphasis added)

The parties largely reiterate the ALJ's above-quoted discussion with Defendant emphasizing the most persuasive components thereof and Plaintiff emphasizing the least persuasive, though in large part they argue past each-other. The ALJ's discussion was in direct response to the Appeal's Council's order and in large part is self-explanatory. Thus, the Court will discuss it directly with particular emphasis on the underlined portions rather than framing the discussion in terms of the parties' respective arguments.

First, the ALJ references the non-examining expert opinion of Dr. Terry which the ALJ obtained in response to the Appeal's Council's instruction. Dr. Terry's opinion states as follows:

Prior ALJ for medium 4/2020 and prior RFCs for hazards only The clmt is obese w a BMI 38 and hx of L knee pain due to OA sp L TKR 2/2019, nonobstructive CAD, NASH and DM .Hx of foot ulcer 1/2018.Preop L knee surgery varus deformity. Limited detailed exams. Recommend light w onset 1/1/2018 and medium prior

8

(AR 1496).  Apart from being a collection of brief truncated phrases and abbreviations, the opinion leaves much to be desired.  It does not indicate what records were reviewed, and there is no articulated basis for choosing January 1, 2018, as the date of onset of the limitation to light exertional work as opposed to anytime up to and including the September 30, 2017, DLI.  The MRI revealing the severe degenerative pathology ultimately requiring total knee replacement was dated April 28, 2018 (AR 879), while the January 1, 2018 date corresponds to no discrete event referenced anywhere in Dr. Terry's opinion, the ALJ's decision, or elsewhere in the record.

Further, the RFC form Dr. Terry completed was a check box questionnaire along with an instruction to narratively describe the basis for the opinion.  AR 1494.  Dr. Terry's effort in that regard was conclusory.  Here, the ALJ should have inquired further before accepting the opinion at face value, especially the arbitrary onset date of January 1, 2018 as the point at which Plaintiff could no longer perform medium exertional work, which not coincidentally post-dated his DLI. Importantly, there is no evidence of any acute injury or inciting event.

The ALJ also relied heavily on the lack of reports of knee pain during the relevant period. The ALJ explained that despite reporting progressive worsening of knee pain at his first orthopedic visit in June 2018, he specified no timeframe for the worsening (AR 1162), yet the ALJ acknowledged that Plaintiff had elsewhere reported a 10+ year history of knee pain and injections--though no corresponding treatment records were produced.  Nevertheless, these two narratives given by Plaintiff to his clinicians are consistent.

The ALJ did acknowledge that "imaging of his knee was ordered in November 2016 and likely would not have occurred in a complete absence of at least one allegation of knee pain, but even the radiologist noted only noted mild degenerative changes at that time." AR 1162.  However, the April 2018 MRI showed severe medial compartment degeneration,  among other abnormalities. AR 880.  This supports the allegation of progressively worsening knee pain, a progression which

most likely took place to some extent prior to the DLI of September 30, 2017

The ALJ further noted that Plaintiff reported pain levels of 3/10 in September 2016, and a 5/10 in December 2016 and May 2017.   For these visits Plaintiff was being seen for his neck, shoulder, and  knee, but the treatment notes do not specify the location of the pain in question.  AR 1162.   However, it would not seem out of the ordinary for a provider treating chronic pain in multiple body parts to ask for one overall pain rating from the patient at intake, rather than rating pain levels on a body part by body part basis.   Nevertheless, these records are seemingly another exception to the ALJ's generalization about no reports of knee pain during the relevant period. Similarly, with respect to the increasing levels of pain from 3/10 in September 2016 to 5/10 in December 2016 and May 2017, this would tend to support Plaintiff's retrospective account of progressively worsening pain levels, especially when considering that the MRI ultimately showed severe degenerative changes in the medial joint compartment.  AR 880.

The ALJ also emphasized that a chiropractor is not an acceptable medical source for the purposes of rendering a diagnosis or establishing an impairment.  However, this is not significantly relevant.  First, the x-ray abnormalities, mild as they were, speak for themselves regardless of which clinician ordered the x-rays.   Further, the MRI of April 2018 establishes that Plaintiff did have severe joint degeneration by that time. AR 879.  The chiropractor's records are thus relevant to the extent they corroborate Plaintiff's subjective account of worsening knee pain before that MRI, and that he sought treatment for the same.

The ALJ further emphasized that "Despite *zero references*[3] to knee pain during the period at issue, he was fully capable of reporting *myriad other symptoms* to his primary care provider . . ." *Id.*  (emphasis added).  The intended inference seems to be that if he was complaining about a myriad of other conditions, he would have complained about debilitating knee pain as well if he

---

[3] Which again is an overstatement for the reasons already explained.

had such pain.  However, the opposite inference seems equally plausible if not more so—that he did not address every condition he had to his medical providers  at each visit.

Next, the ALJ states that "It seems truly remarkable that not one single abnormal physical finding related to his knee would be made through October 2017 if, indeed, the condition <u>was as limiting and debilitating as alleged</u>."  AR 1163 (emphasis added).  The point is not compelling.  Presumably the ALJ is referring to an abnormal physical *examination* finding, such as swelling or ROM deficiencies, because again, the November 2016 x-ray did document abnormalities.  Further, though the lack of such physical examination abnormalities is perhaps remarkable, it would be even more remarkable if the knee condition addressed in November 2016 went dormant for 18 months only to resurface in April 2018 with severe pathology warranting total knee replacement, particularly in the absence of any acute injury or inciting event--which is not mentioned anywhere in the record.

Further, the ALJ's choice of words is notable in expressing doubt as to whether the knee condition was "as limiting and debilitating as alleged."  Disability under the regulations is a legal conclusion resulting from various inputs including exertional tolerance.  Thus, the issue is whether as of September 30, 2017, or earlier, Plaintiff—an obese individual of advanced age with a pre-existent degenerative knee condition—was able to perform medium exertional work, including standing/walking 6 of 8 hours and lifting up to 50 pounds 1/3 of the day, given that 7 months later the April 2018 MRI depicted severe pathology warranting total knee replacement.  The proposition is questionable regardless of whether the knee pain was truly "debilitating" or "disabling" in the colloquial sense.

On the subject of exertional tolerance, it is also notable that the ALJ expressed an intention on remand to further reduce the exertional requirements in the RFC.  Indeed, the ALJ stated: "In giving him a large benefit of the doubt, I simply provided <u>additional restrictions related to the knee</u>

in combination with his obesity, including limiting his ability to carry weight, balance, stoop, kneel, crouch, crawl, or climb." AR 1160 (emphasis added). That is not accurate. The RFCs set forth in the two decisions were identical—medium work with postural restrictions—save for the prohibition on commercial driving. AR 29; 1159. This calls into question whether the RFC even accurately reflects the ALJ's intention, much less Plaintiff's actual capabilities.

Finally, the ALJ states:

> So the ultimately question is what is more likely than not… that the claimant's left knee that was replaced in February 2019 was at the same or near the same level of debilitating pain and functional loss all the way back to January 2015 despite the minimal diagnostic findings, dearth of subjective complaints and objective findings related to the knee, and the complete lack of treatment for the knee through the date last insured, or that his function was largely intact until he began to experiencing significant knee pain in April 2018 well after the date last insured that quickly resulted in referrals for an MRI, physical therapy, and an orthopedic consult that resulted in the knee replacement in February 2019?

Of note here, Plaintiff would not necessarily need to justify the allege onset date "all the way back to January 2015" if he became disabled by the date last insured of September 30, 2017. *See Smith v. Kijakazi*, 14 F.4th 1108, 1116 (9th Cir. 2021) (finding the ALJ "erred by seeking only to reach a single disability determination for the entire multi-year period, thereby failing to consider whether Smith was disabled for only a qualifying, early portion of that time."); 42 U.S.C. § 1382c(a)(3)(A) (explaining disability finding requires a claimant show she is  unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months).

Thus, Remand is appropriate for the ALJ to consult a medical expert to provide an opinion on that issue and articulate the basis for that opinion.

## B.    The SSI Claim

Plaintiff provides a litany of scattershot arguments concerning his SSI claim, including whether he should be excused from failing to complete the appropriate form, and whether the ALJ

erred in "mechanically applying" the grid rules rather than considering this as a "borderline age" situation such that the higher age category might apply.  Yet, as Defendant notes in response, and which Plaintiff fails to address in reply, "Plaintiff was 68 years old at the time of the ALJ decision and so, was already of advanced age, which is the highest age category there is (AR 222 (setting out Plaintiff's date of birth), 1168 (ALJ decision was dated November 27, 2023)). 20 C.F.R. § 404.1563(e) (advanced age is 55 years or older)."  Resp. at 12 (Doc. 19).

Defendant further explains, "To be eligible for SSI, the countable resources that a claimant and his spouse own cannot be worth more than the resource limit of $3000. 20 C.F.R. §§ 416.202(c), 416.1205(c)," and on July 18, 2016 "Plaintiff's SSI application was denied because his and his wife's resources exceeded that regulatory maximum (AR 90-101)." *Id.*

Plaintiff acknowledges in reply that these are true statements.  Reply at 5-6 (Doc. 20).  Yet Plaintiff appears to argue that while the administrative proceedings dragged on, as they inevitably do, his financial circumstances changed such that he no longer exceeded the resource threshold and thus the agency could exercise its discretion to reopen the SSI claim consistent with the purpose behind the act to provide a lifeline to destitute individuals.  However, Plaintiff does not establish that his financial circumstances did in fact change, nor that such a change in circumstances justifies reopening an SSI claim, an assertion for which he provides only unpublished district court authority. This assertion is particularly questionable under circumstances where, as here, the matter is on remand for an entirely different purpose-- namely to explore whether his knee impairment related back to the relevant period.  Thus, the discussion has little if any merit.

### C.     The Visual and Cardiac Impairments

At the September 2016 consultative examination, Plaintiff's vision was measured at 20/70 bilaterally.  AR 383.  Plaintiff had cataract surgery on November 9, 2017. AR 982, 987. A subsequent consultative examination showed vision in April 2018 as 20/50 right and 20/30 left,

13

both far and near deficits.  AR 435.  In consideration of this, the ALJ found in the RFC that Plaintiff could not perform any jobs "requiring discrimination of <u>very small objects</u>, particularly those <u>at a distance</u>." AR 29, 1158 (emphasis added).

Plaintiff contends that "small" and "at a distance" are vague terms and could be construed in a way that precludes performance of jobs such as Farm Worker II, DOT 407.687-010, which requires occasional near acuity, depth perception and color vision with constant exposure to weather.  MSJ at 16 (Doc. 17).  This discussion is not particularly relevant or helpful considering that Farm Worker II is not the past relevant work the ALJ found Plaintiff could perform at step four which was tractor trailer truck driver, nor is that the same job the VE identified at step five where the VE set forth three other jobs someone with Plaintiff's RFC could perform--patient transporter, courtesy clerk bagger, and agricultural packer.

Further, as Defendant emphasizes, the ALJ and the VE had a reasonably detailed discussion at the hearing, including: **1-** explaining how the terms used in the RFC to describe visual limitations were being used; **2-** whether the visual limitations in the RFC would preclude past work, which it wouldn't; and **3-** whether the addition of another hypothetical limitation concerning occasional near and far acuity would preclude other work in the national economy.  AR 1196–99.  The VE indicated that the near and far acuity limitation would preclude only past work but not the other jobs in the national economy.  AR 1197–99.  Thus, Plaintiff's argument is unavailing.

Finally, Plaintiff contends the ALJ did not address his cardiac issues, including: **1-** the July 14, 2018, preoperative cardiac evaluation noting a history of atypical chest symptoms; **2-** history of an "enlarged heart" per his verbal report (AR 884-885); **3-** the February 20, 2019, EKG in preparation for surgery noting LAD 50% mid-section lesion and RCA with a 70% proximal lesion (AR 565-566) consistent with listing level severity.[4]

---

[4] MSJ at 16 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 4.04 C, Ischemic heart disease. ("a. 50 percent or

Defendant notes in response that the ALJ concluded these diagnoses post-dated the DLI, with no evidence of treatment, complaint, or diagnosis prior to that date. AR 1156-57. Indeed, it appears the records concerning Plaintiff's cardiac issues were generated largely in connection with his knee replacement pre-op physicals for pre-op clearance. AR 884–85; AR 565–66.

Plaintiff reiterates the Appeals Council's instruction for the ALJ to "If necessary, obtain evidence from a medical expert related to the *date of onset*." AR 1275 (emphasis added). Plaintiff asserts that the ALJ "did not do so and instead relied upon his own medical expertise to dismiss relevant evidence" and that "an ALJ is 'simply not qualified to interpret raw medical data in functional terms.'"

The Appeals Council's instruction to obtain medical expertise about the "date of onset" was clearly in regard to the left knee impairment and whether the post-DLI MRI pathology related back to the relevant period, which was the subject of the vast majority of the Appeals Council's discussion. AR 1273–75. The only exception was in regard to the "compounded" effects of other impairments, specifically obesity in conjunction with the left knee, which the ALJ had not adequately articulated.

There is simply no language in the Appeals Council's remand instructions, or the Court's remand order,[5] which suggest the post-DLI records concerning Plaintiff's cardiac condition were to be addressed. Further, even if the Appeals Council had identified that as a subject to be addressed on remand, Plaintiff provides minimal effort to substantiate the suggestion that the cardiac impairment might have also related back to the relevant period or caused functional limitations. Thus, this argument is not convincing.

## VI.    Conclusion

---

more narrowing of a nonbypassed left main coronary artery; or b. 70 percent or more narrowing of another nonbypassed coronary artery")).

[5] *See* 21-cv-00728 (ECF No. 22) (discussing only the left knee impairment as the subject of remand)

Remand is appropriate for the ALJ to conduct a new hearing and inquire of a medical expert as to: **1-** the likely timeline for the progression of the severe degenerative changes depicted in the April 28, 2018 MRI, including, if applicable, any discernable relationship between the November 2016 x-rays and the April 2018 MRI; **2-** the development of the other pathology depicted in the April 28, 2018 MRI (complex meniscal tears, ACL abnormalities, etc); and **3-** the impact of those imaging abnormalities in connection with Plaintiff's obesity and other physical impairments on Plaintiff's ability to perform medium work during the relevant period.  The ALJ should further obtain an explanation from the expert as to <u>the basis for the opinion</u> in contrast to the unexplained conclusion Dr. Terry provided as quoted above.

## VII.    Order

For the reasons stated above, substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, it is ordered that:

1.  Plaintiff's motion for summary judgment (Doc. 17) is **GRANTED** in part.

2.  Defendant's cross motion (Doc. 19) is **DENIED**

3.  The Commissioner's decision is reversed and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

4.  The Clerk of Court is directed to enter judgment in favor of Plaintiff Arnulfo Lamas Galvan and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __**December 7, 2024**__                    _____**/s/ Gary S. Austin**_____
                                                                        UNITED STATES MAGISTRATE JUDGE